Filed 7/23/25  In re R.L. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.L., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>            v.<br><br>M.H.,<br><br>    Defendant and Appellant. | G065043<br><br>(Super. Ct. No. 24DP0424)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Daphne G. Sykes, Judge. Reversed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

*     *     *

In this juvenile dependency proceeding, Mother appeals from the judgment of the court that, first, determined Minor was described by Welfare and Institutions Code section 300, subdivision (b)(1), and thus fell within the jurisdiction of the court; second, removed Minor from Mother's custody; and third, vested Father with full physical and legal custody of Minor, following which the court terminated the proceeding. Mother contends there was no substantial evidence to support a finding that the court had jurisdiction over Minor. She also contends there was no substantial evidence to support a removal of Minor from her custody. And finally, she contends the court abused its discretion in vesting complete custody of Minor with Father. We agree with Mother's first contention: the court lacked jurisdiction because there was no evidence that Minor had suffered serious physical harm, nor was there evidence of a substantial risk that Minor would suffer serious physical harm. Because the court should not have exercised jurisdiction in the first place, we do not address Mother's remaining contentions.

FACTS

At around 4:00 p.m. on March 27, 2024, Mother borrowed a car belonging to her great grandparents. She said she obtained permission from her great grandmother. She took Minor (approximately 3 years old) from Hemet to Oceanside, where her car had previously been towed, to retrieve her belongings from her car. After spending some time with Minor at the beach, it was late, so she tried to rent a room from a motel, but realized she did not have enough money. Instead, she got dinner and sat in the parking lot with minor until, eventually, in the wee hours of the morning, she decided to drive back to her great grandparents' home.

Her great grandfather became upset because Mother did not ask him directly to borrow the car (the great grandmother suffered from Alzheimer's and often forgot things), nor did Mother check in with her whereabouts, so he reported the vehicle stolen. At approximately 3:00 a.m., Mother was arrested on her way home for driving a stolen vehicle. Minor was in the vehicle at the time. Minor was properly restrained in a car seat and appeared well. Mother was cooperative with law enforcement and tried to explain it was a misunderstanding and she had permission to use the car. Nevertheless, she was arrested, and because Mother was taken into custody, Minor was taken to Orangewood Children and Family Center (Orangewood).

At the time of her arrest, Mother did not have stable housing. She would "couch surf" between her great grandparents in Hemet, various hotels, and friends in San Diego. Mother denied any active mental health diagnoses and denied any substance abuse problems. Mother's criminal history consisted of an incident in 2015 in which she assaulted another person with a knife in an incident Mother described as mutual combat. The victim was a girlfriend of one of Mother's former partners.

After the arrest, the assigned social worker interviewed various family members of Mother, all of whom stated that Mother was a good parent and that they had no concerns in that regard, other than Mother's unstable housing. The maternal great grandmother confirmed that Mother stays with them sometimes and that they do give her permission to use their vehicle for errands. She further confirmed that on the day of the arrest, Mother did have permission to use the vehicle, but not to "leave town." None of the family members had concerns about substance abuse.

One of Mother's aunts reported that Mother sometimes exhibited erratic behavior, which included becoming verbally aggressive when she is

3

upset. However, other than the incident that led to Mother's incarceration, the aunt was not aware of any instances of physically aggressive behavior.

Another aunt had obtained a restraining order against Mother. When interviewed, that aunt explained it was "due to the mother's unresolved anger management problem" and "due to [Mother's] inability to control her emotions and keep her hands to herself. She communicated the mother and child were previously residing with her, but it became 'toxic,' and the mother left the home with the child and did not allow [the aunt] to have contact with [Minor.]"

Father similarly reported aggressive verbal behavior from Mother at times, to the point where in one instance she threatened to kill him. Father was living in Las Vegas at the time and working as a truck driver. He had no relationship with Minor.

Staff at Orangewood reported that they had no concerns about Minor's well-being, noting that Minor was "active and developmentally age appropriate." Another staff member described Minor as "well behaved, smart, confident, and very social."

At the detention hearing on April 2, 2024, the court found there was a substantial danger to the physical health of the child and ordered Minor detained. Mother was given 20 hours of supervised visitation.

On April 6, 2024, Mother appeared for a scheduled visit. However, she absconded with Minor and did not respond to attempts to contact her. She was located later that day by police officers and was arrested. Minor was returned to his caretaker. Subsequently, the court reduced Mother's visitation from 20 hours to eight hours per week.

Afterward, on April 15, 2024, the assigned social worker spoke with Mother and recommended that Mother participate in anger

4

management, random drug testing, SCRAM, parenting classes, individual counseling, and a mental health assessment. Mother expressed a willingness to participate in all services.

In another interview the following month, Mother acknowledged "she made an impulsive emotional decision when she absconded with the child during a supervised visit. The mother communicated she made the situation much worse by fleeing with the child and reported being remorseful. The mother explained she contacted the caregiver . . . and apologized to her for absconding with the child and for being disrespectful to her."

On April 19, 2024, Minor was placed with his paternal grandmother.

On May 16, 2024, the court authorized funding for substance abuse testing for Mother. Importantly, the court did not order Mother to start drug testing, and thus it was voluntary at that point. SSA submitted a referral for Mother to do random drug testing, but Mother failed to appear at all of her tests from late May through early July 2024.

In July 2024, a case manager at Project Kinship confirmed that mother had been given housing through its program. As part of that program, Mother was required to engage in drug testing. Although the case manager did not specifically know the results of that testing, he said he would have been notified if there had been any positive results (and apparently had received no such notifications).

In August 2024, Mother was present for some substance abuse testing. On two occasions, she tested negative. On two occasions, she tested positive for alcohol. And on two occasions she was a no-show.

The jurisdictional hearing was completed on September 18, 2024. The court found an interlineated petition to be true and exercised jurisdiction

5

under Welfare and Institutions Code section 300, subdivision (b)(1) (substantial risk of serious physical harm). Reflecting on Mother taking the great grandparents' vehicle and later absconding with Minor, the court commented, "There's erratic behavior. There's a lapse of judgment. There's a violation of the court order . . . ." "And the fact that this child might have looked okay and did not have physical harm yet does not mean that there's not a significant, that it has not been demonstrated that there is a risk of this child – a substantial risk, I find. And so, therefore, I am going to otherwise sustain this petition."

The disposition hearing was set for October 2024. Around that time, SSA released minor to Father, who, though he did not have a significant relationship with Minor prior to the dependency proceeding, had been visiting regularly. The court continued the matter for 60 days to assess how Father did.

At the time, Mother was living at Project Kinship, where she was undergoing random drug testing. The house manager reported that all of Mother's tests were clean. Mother had ceased showing up for testing through SSA.

Around November 2024, Mother ceased communicating with SSA. She was in Las Vegas at the time and was continuing to visit with Minor with no significant concerns noted by Father.

Neither parent personally appeared at the disposition hearing on December 20, 2024. Father had authorized his counsel to appear on his behalf. Mother's counsel, however, had been unable to get a hold of her.

At the disposition hearing, the court removed custody of Minor from Mother and vested full legal and physical custody of Minor with Father.

6

At that point, the court ordered the dependency proceeding terminated. Mother appealed.

## DISCUSSION

"A 'juvenile court' is a superior court exercising limited jurisdiction arising under juvenile law. [Citation.] Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions Code." (*In re Chantal S.* (1996) 13 Cal.4th 196, 200.)

Welfare and Institutions Code section 300 sets forth various bases upon which a juvenile court can exercise its limited dependency jurisdiction. Here, the court exercised its jurisdiction based on section 300, subdivision (b)(1). That section provides, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:" "(b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] (B) The willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left. (C) The willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment. (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

7

The burden of proof is on the petitioner, Social Services Agency, to establish, by a preponderance of the evidence, that a juvenile is described by a subdivision of section 300. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Broadly speaking, SSA defends the court's exercise of jurisdiction based on two incidents: the initial apprehension of Mother and Minor in the great grandparents' car, and Mother absconding. We conclude neither incident, considered separately or together, justified exercising jurisdiction under section 300.

Regarding the incident with the vehicle, no one in this proceeding is suggesting that Mother actually stole her great grandparents' car. As SSA describes the situation, Mother "took a vehicle outside the bounds of her arrangement with the maternal great-grandparents, with whom her and [Minor] lived intermittently." Essentially, she stayed out too late with the car. SSA blames Mother for "plac[ing] [Minor] in a situation where he was out, without a caregiver, at 3:00 in the morning and had to be taken into protective custody by law enforcement."

We have serious doubts about whether Mother could have foreseen that her great grandfather would report the vehicle stolen. But even if that is the case, there is no nexus between this incident and any physical harm to Minor. Minor was appropriately secured in a car seat and appeared well at the time of the arrest. Mother was cooperative with law enforcement and thus did not create any particular risk of harm associated with the arrest. Moreover, there is no reason to expect, even if Mother did get arrested, that the arrest would somehow result in serious physical harm to Minor. Law enforcement is well equipped to safely transport a minor to appropriate care facilities, such as Orangewood. Nothing about this incident

8

placed Minor at substantial risk of serious physical harm, and thus we cannot infer from this incident that Mother is likely to do so in the future.

The other major incident in this case was Mother absconding with Minor. Without minimizing the seriousness of her violation of the court's visitation order, this incident similarly suffers from a lack of any nexus to serious physical harm. Although the record is bereft of details, Mother does not appear to have done anything risky with Minor during the incident. She simply did not show up to return Minor to his caretaker and then refused to answer phone calls and texts. This provoked a law enforcement response, but, again, there was no evidence that Mother tried to evade law enforcement or was uncooperative when arrested. Nothing about this incident placed Minor at substantial risk of serious physical harm, and thus we cannot infer from this incident that she is likely to seriously harm Minor in the future.

Ultimately, even if we accept the trial court's characterization that these incidents reflected "poor judgment" and "erratic behavior," there simply was no nexus between that behavior and a substantial likelihood of Minor suffering serious physical harm. As was the case in *In re David M.*, "The record on appeal lacks any evidence of a specific, defined risk of harm . . . . Certainly, it is possible to identify many possible harms that *could* come to pass. But without more evidence than was presented in this case, such harms are merely speculative." (*In re David M.* (2005) 134 Cal.App.4th 822, 830, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622.)

Beyond these incidents, the only other evidence SSA points to is: evidence that Mother had anger management issues; evidence of Mother drinking alcohol; and evidence that she previously smoked marijuana.

There was no evidence that Mother's anger management problems, which were only vaguely referred to in the record, ever placed

Minor at any risk of harm. The principal evidence of her anger management issues was multiple reports that she could become verbally aggressive. There was no evidence of Mother becoming verbally aggressive with Minor, however, and, in any event, verbal aggression does not amount to serious physical harm. The only evidence of physical aggression was Mother's conviction from nine years prior for assaulting an ex-boyfriend's partner with a knife. Aside from that being remote in time, Mother described it as mutual combat, and there was otherwise no evidence in the record of the circumstances of that incident. That incident is not sufficient to create a substantial risk that Minor will suffer seriously physical harm in Mother's care.

The evidence of substance use consisted of two tests positive for alcohol—in what amount—is unclear and an *unfounded* report from *nine years before* that Mother smoked marijuana heavily. Both alcohol and marijuana use is legal under California state law, and there was no evidence that Mother's use of these substances amounted to abuse of the substances, nor evidence that Minor was placed at any risk of harm based on Mother's use. The only other circumstance SSA points to is Mother's refusal to drug test through SSA. But that testing was voluntary, and thus we cannot assume that she was abusing substances merely because she declined to test. That is particularly true in this case, where there was not even any circumstantial evidence that Mother was abusing substances. None of the people interviewed in this case, for example, had any concerns about her abusing drugs or alcohol, and no one ever reported that she appeared intoxicated.

SSA's brief also consistently refers to Mother's "unresolved mental health" issues. However, the evidence on that topic was so weak that

10

the trial court specifically commented that it did "not put any weight on any alleged specific mental health diagnosis."[1]

Whether considered in combination or separately, the evidence simply did not show that Minor was at substantial risk of suffering serious physical harm under Mother's care. Quite to the contrary, everyone who was interviewed in this case reported that Mother takes good care of Minor. Everyone who encountered Minor noted that he was healthy, well adjusted, and developmentally on track. As such, the juvenile dependency petition should have been dismissed.

---

[1] The only other incident SSA points to is a phone call that Father recorded in which Mother is heard to be speaking with Minor and casually using swear words, and Minor is similarly heard to casually use swear words in response. While that may not be how we would recommend a parent to speak to a young child, it does not create a substantial risk of serious physical harm. In that same phone call, Mother recommends that Father add a "cap" of bleach to Minor's bathwater. While that is an unusual suggestion, there was nothing in the record to indicate that a small amount of bleach in a bath is likely to cause serious physical harm. In fact, both the Mayo Clinic and the American Academy of Allergy Asthma & Immunology recommend a small amount of bleach in a bath to treat certain skin conditions. (See <https://www.aaaai.org/tools-for-the-public/conditions-library/allergies/bleach-bath-recipe-for-skin-conditions> [as of July 2, 2025]; <https://www.mayoclinic.org/diseases-conditions/atopic-dermatitis-eczema/expert-answers/eczema-bleach-bath/faq-20058413> [as of July 2, 2025].) We express no judgment on whether it was appropriate in Minor's case. We simply note that it would not obviously create a risk of harm, and the evidence is otherwise insufficient to conclude it would. Additionally, the trial court did not rely on this incident in finding a substantial risk of serious physical harm.

11

## DISPOSITION

The judgment is reversed.


                                        SANCHEZ, ACTING P. J.

WE CONCUR:


GOODING, J.


SCOTT, J.